BUCHALTER
A Professional Corporation
MARK M. SCOTT (SBN: 138569)
SEAN M. CASEY (SBN: 179641)
18400 Von Karman Avenue, Suite 800
Irvine, California 92612-0514
Telephone: (949) 760-1121
Fax:       (949) 720-0182
Email: mscott@buchalter.com
       scasey@buchalter.com

Attorneys for Plaintiff
SERTANT CAPITAL, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERTANT CAPITAL, LLC, a Delaware limited liability company,<br><br>          Plaintiff,<br><br>     vs.<br><br>LEASETEAM, INC., a Nebraska corporation,<br><br>          Defendant. | CASE NO.: 8:18-CV-1092<br><br>**COMPLAINT FOR:**<br> (1) **BREACH OF WRITTEN CONTRACT;**<br> (2) **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**<br> (3) **FRAUD;**<br> (4) **NEGLIGENT MISREPRESENTATION;**<br> (5) **UNFAIR BUSINESS PRACTICES (CBPC §17200);**<br> (6) **DECLARATORY RELIEF; AND**<br> (7) **ACCOUNTING**<br><br>     **JURY TRIAL DEMANDED** |

    Plaintiff Sertant Capital, LLC ("Sertant Capital")

alleges as follows:

## THE PARTIES

    1.   Plaintiff Sertant Capital is, and at all times

herein mentioned was, a limited liability company duly

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

BN 33298676v1

organized and existing under the laws of the State of Delaware, with a principal place of business at 18401 Von Karman Ave., Suite 260, Irvine, Orange County, California, 92612, and has been and is conducting business in this District.

2.   At all relevant times, Sertant Capital has been and remains in the business of, among other activities, providing nationwide commercial leasing and financing services that enable businesses of all sizes to acquire equipment, vehicles, and other property for their business.  Sertant offers valuable services that fulfill a significant marketplace need in a highly competitive market in which commercial finance and leasing companies actively compete with each other for customers.

3.   Sertant Capital is informed and believes and thereon alleges that Defendant LeaseTeam, Inc. ("LeaseTeam") is a Nebraska corporation with its principal place of business at 4139 143rd Circle, Omaha, Nebraska, 68137.  Defendant LeaseTeam markets itself as providing software sales and customization services, and at all relevant times has conducted and conducts substantial business with parties such as Sertant Capital in this district.

4.   Sertant Capital is informed and believes and thereon alleges that Defendant LeaseTeam, Inc. is not qualified to do business in the State of California, as it is not listed in the records of the California Secretary of State.

## JURISDICTION AND VENUE

5.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332 et seq. because there is complete diversity of citizenship between Sertant Capital and LeaseTeam, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.  There is complete diversity between Sertant Capital and LeaseTeam because Sertant Capital is organized under the laws of Delaware with its' principal place of business in this District, and LeaseTeam is a Nebraska corporation with its' principal place of business in Nebraska.

6.    This Court has specific personal jurisdiction over the parties because this claim arises from breach of a contract between Sertant Capital and LeaseTeam that was executed in this District, and because both parties performed actions under the contract at Sertant Capital's offices in this District.  As alleged below, the events and transactions at issue occurred in California between Sertant Capital and LeaseTeam, and are based on LeaseTeam's purposeful directed transactions and interactions with Sertant Capital in this District.

7.    Venue is proper in the United States District Court for the Central District of California pursuant 28 U.S.C. §§ 1391 et seq., because the events and omissions arising under the contract substantially occurred in this District, and because Sertant Capital and LeaseTeam

1  have performed actions giving rise to this action in
2  this District.

3     8.  The contract at issue was executed in this
4  district as is evidenced by the address for Sertant
5  Capital that is identified on the top of page one in the
6  initial paragraph of Exhibit 1 hereto, entitled
7  "Professional Services Agreement" (PSA) and also as
8  evidenced by the "Notice" provision for Sertant Capital
9  in paragraph 14 of this same Exhibit 1.

10    9.  The PSA and the other related agreements
11 entered into between Sertant Capital and LeaseTeam are
12 herein after referred to herein as the "Contract".
13 LeaseTeam's Contract with Sertant Capital was directed
14 to the sale, implementation, customization, and delivery
15 of LeaseTeam's lease management software system for use
16 by Sertant Capital.

17    10. LeaseTeam's lease management software system is
18 referred to in the Contract and its constituent
19 agreements and documents as "Aspire."  The Contract and
20 its constituent agreements and documents, and the
21 negotiations between LeaseTeam and Sertant Capital to
22 address LeaseTeam's repeated delays, errors, omissions,
23 and failure to perform also occurred in this district.
24 Sertant Capital's performance and payments made under
25 the Contract also occurred in this District.

26            **FACTS COMMON TO ALL CLAIMS FOR RELIEF**

27    11. Sertant Capital was established in Irvine,
28 California, to enable businesses of all sizes to

acquire, finance, lease, and disposition all types of equipment, vehicles, and other property for their respective businesses. Additionally, Sertant Capital enables investors to participate in and to facilitate such acquisition and financing opportunities through a wide range of commercial finance and lease funding arrangements.

12. Sertant Capital is an active member of many finance and leasing, industry-leading organizations, including for example, the American Association of Commercial Finance Brokers, the Equipment Leasing and Financing Association, and the National Equipment Financing Association, among others.

13. Between January and May of 2017, Sertant Capital shared various complex business model examples with LeaseTeam. Such examples included, but were not limited to, Sertant Capital's proprietary written descriptions and orally described lease finance requirements as well as detailed electronic spreadsheets that financially modeled Sertant Capital's complex business requirements and financial models for various leasing finance transactions, among other related transactions.

14. These examples were provided to LeaseTeam to enable LeaseTeam to demonstrate a "proof of concept" capability demonstration of its Aspire lease management software system. The mutual goals were to enable LeaseTeam to intimately understand Sertant Capital's

complex operations, business models, and financing
transactions, so that LeaseTeam could be satisfied its
product would meet Sertant Capital's requirements.

15. Sertant Capital continuously sought to
communicate to and to ensure that LeaseTeam had the
technical and financial details needed from Sertant
Capital, such that LeaseTeam could guarantee its Aspire
lease management software system had the technical and
financial capabilities to meet Sertant Capital's
business critical, best-in-class, and technically
challenging business model requirements, and so that
certain aspects of Sertant Capital's lease finance
business models and lease finance transactions and
related business processes could be automated by
LeaseTeam's Aspire.

16. Multiple examples of Sertant Capital's complex
business models and lease finance transactions were
communicated via electronic mail message by Sertant, and
were sent to LeaseTeam's co-founder and Executive Vice
President, Mr. Randy Haug and his colleague Chris
DeVeney, among others. At least one such Sertant
Capital complex business model was detailed in an
electronic spreadsheet that was communicated on or about
January 19, 2017, and others were communicated
thereafter, which were received and acknowledged by Mr.
Haug and his LeaseTeam colleagues.

17. On or about February 21, 2017 and thereafter at
other times, a proof of concept demonstration was

conducted by Mr. Haug and others at LeaseTeam, wherein LeaseTeam asserted that its' Aspire lease management software system had the technical and financial capabilities to enable, automate, and manage important aspects of Sertant Capital's complex lease and financing business models and transactions, and related critical business processes and requirements.

18. At all relevant times, LeaseTeam accepted Sertant Capital's business model examples, including the detailed electronic spreadsheet financial models, and unequivocally and without reservation asserted its Aspire lease management software system had the technical and financial capabilities to accommodate Sertant Capital's complex, financial business models, and lease and finance transactions.

19. LeaseTeam's co-founder and Executive Vice President, Randy Haug and his LeaseTeam colleagues aggressively and relentlessly pursued execution of the Contract with Sertant Capital, with assertions that the Aspire lease management software system will meet Sertant Capital's critical business requirements for its complex business models, and lease and financing transactions and related business processes and operations.

20. After various proof of concept interactions and assertions by LeaseTeam that its Aspire lease management software system had the technical and financial capabilities to meet Sertant Capital's needs, Sertant

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

Capital negotiated with LeaseTeam to install, configure, implement, customize, and deliver LeaseTeam's Aspire commercial lease management software system, which LeaseTeam refers to in short as its "Aspire System," and which is also referred to herein as "Aspire".

21. On or about May 22, 2017, at the conclusion of such negotiations, Sertant Capital and LeaseTeam executed the Contract that is attached hereto as Exhibit 1, which includes:

(a) the "Professional Services Agreement" (PSA), which included a multi-page "Exhibit A" that further included:

(i) a "Service Level Agreement" (SLA) entitled "ASP - 3 Year Term Aspire with Loans System Small Business Edition," and

(ii) a schedule entitled "Professional Services (For Budgetary Purposes Only)."

22. The latter schedule, "Professional Services (For Budgetary Purposes Only)" estimated that LeaseTeam would complete the Aspire configuration for Sertant Capital in 24 "Professional Services Days" after work commenced.

23. The Contract embodied by the PSA and SLA, among other parts, require payments by Sertant Capital to LeaseTeam totaling at least about $185,800, excluding additional costs for travel, lodging, and food costs required to enable LeaseTeam personnel to travel to Sertant Capital offices in Irvine, California to

1  install, configure, and ultimately deliver the Aspire

2  product.

3      24. Some of these required payments were due in

4  advance and prior to, and during implementation of the

5  Aspire product, and other payments are payable over the

6  three year term of the Contract. Additional payments by

7  Sertant Capital to LeaseTeam are required for various

8  possible options available for the Aspire product, which

9  may be implemented during the three-year period of the

10 Contract, and which in total were to cost at least an

11 additional $70,400 in additional costs to Sertant

12 Capital over the Contract term. Exhibit 1, "Optional

13 Service Level Agreement (SLA) Fees."

14     25. The Contract was executed in Irvine, California

15 on or about May 22, 2017 by Sertant Capital's Executive

16 Vice President and Chief Operating Officer Daniel J.

17 Krajewski, and on or about May 23, 2017 by LeaseTeam's

18 Chairman, Russell Hallberg. After the relentless pursuit

19 of the executed Contract by LeaseTeam, Sertant Capital

20 expected work would commence immediately or within a

21 reasonably short time of perhaps a week or two after

22 execution.

23     26. Further, Sertant Capital was informed and

24 believed that LeaseTeam would commence work and complete

25 the project no later than about the end of June or

26 beginning of July, 2017, because the Contract expressly

27 specified only 24 "Estimated Professional Services Days"

28 were required to complete the configuration,

installation, and delivery of the Aspire product. Exhibit 1, "Estimated Professional Services (Billed as Rendered – Plus Travel Expenses)."

27. However, after more than a week of silence by LeaseTeam after the Contract was executed, Sertant Capital was forced to reach out on May 31, 2017 to Mr. Haug, and ask when LeaseTeam intended to start work. Mr. Haug replied without specifying any date, but instead offering assurances that a LeaseTeam project team would be assigned, and dates would be scheduled to start work.

28. LeaseTeam did not assign a team or dates to start work during May or even early June, 2017. Instead, LeaseTeam issued to Sertant Capital invoice no. 043125, dated May 31, 2017 and totaling about $24,430, for advance license fees for the Aspire product, and prepaid technical services and Aspire support services.

29. Sertant Capital remained hopeful despite the LeaseTeam delays. As a show of good faith, Sertant Capital paid the $24,430 invoice in full on June 14, 2017, even while LeaseTeam remained silent and did not start work as expected.

30. Inexplicably, LeaseTeam remained silent for a full three weeks after the Contract was signed. After Sertant Capital made the good faith advance payment, and exhibited continuing patience over the three weeks of silence, Sertant Capital was compelled to again follow up with phone calls and email inquiries to Mr. Haug and

1    others at LeaseTeam.

2        31. On   June   22,   2017,   a   LeaseTeam   project

3    coordinator, Laura Montgomery, finally responded by

4    electronic mail, and suggested LeaseTeam could start

5    work beginning later in the third quarter of 2017, on

6    either August 14, 2017 or September 11, 2017.

7        32. Surprised and dismayed, Sertant Capital's Mr.

8    Krajewski replied immediately the same day, on June 22,

9    2017. In an email message to both Ms. Montgomery and Mr.

10   Haug, Mr. Krajewski was compelled to remind LeaseTeam

11   that weeks had elapsed without communication or progress

12   of any kind.

13       33. Suspecting now that the 24-day-long LeaseTeam

14   Aspire project and ultimate delivery would likely slip

15   towards the end of July or the beginning of August, Mr.

16   Krajewski urged LeaseTeam to start work sooner during

17   July, and not sometime later in the third quarter of

18   2017.

19       34. Despite Sertant Capital's urgency, LeaseTeam

20   went silent yet again.  After another quiet week, Mr.

21   Haug finally replied on July 3, 2017, and conceded that

22   LeaseTeam could finally start work on the 18th and 19th

23   of July, 2017.

24       35. Mr. Haug also promised on behalf of LeaseTeam

25   that after starting work in Mid-July, LeaseTeam would

26   complete the Aspire "configuration and deployment the

27   week of August 21, 2017" for Sertant Capital.

28   ///

36. Sertant Capital was somewhat relieved when LeaseTeam's Chris DeVeney traveled to Sertant Capital's premises in Irvine, California on July 18th and 19th, to finally start work, and with the goal to ascertain further details of Sertant Capital's business operations and processes, as well as the earlier described complex business models, and finance and lease transactions.

37. Mr. DeVeney's visit was identified by LeaseTeam as a "Sertant Capital ASPIRE Discovery Analysis."

38. LeaseTeam's goal for Mr. DeVeney's mid-July, 2017 visit and analysis was to enable LeaseTeam to gain the more extensive technical and financial details of Sertant Capital's proprietary and complex business models, than that learned previously from the Sertant Capital detailed examples and the subsequent "proof of concept" demonstration and interactions of January and February, 2017.

39. Mr. DeVeney's analysis was to also presumably to enable satisfaction of LeaseTeam's and Mr. Haug's promised "configuration and deployment," during the week of August 21, 2017. With more than 30 calendar days available between July 19, 2017 and the week of August 21, 2017, Sertant Capital believed the 24-day LeaseTeam Aspire installation was back on track, even though more than a month had already been lost to inaction by LeaseTeam.

40. After Mr. DeVeney completed his California visit on behalf of LeaseTeam, and the LeaseTeam "Sertant

Capital ASPIRE Discovery Analysis," Sertant Capital
followed up right away by electronic mail on July 25,
2017.

41. That day, Mr. Jeff Macartney, Sertant Capital's
Chief Financial Officer, communicated by email to
LeaseTeam's Mr. DeVeney, to confirm again that LeaseTeam
and the Aspire product could meet at least three of the
most important requirements of Sertant Capital's
business models and lease and finance transactions,
which had been shared previously with LeaseTeam during
the above-described communications during January
through March, 2017.

42. Specifically, Mr. Macartney asked LeaseTeam's
Mr. DeVeney to confirm that Aspire and LeaseTeam had to
the capability to:

(a) Bill interim rent at 100% of the rental
payment for any number of days or months prior to the
documented start date of the schedule,

(b) Bill progress rent at less than 100% of the
rental payment for any number of days or months on the %
of the equipment cost funded, and

(c) Bill progress interest, even if the Aspire
A/P module was required to be added as option.

43. Mr. DeVeney confirmed that LeaseTeam and the
Aspire product could meet these requirements.

44. LeaseTeam again slowed down, and another two
weeks passed. It was not until August 4, 2017, that
LeaseTeam's Project Coordinator, Ms. Montgomery shared

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

COMPLAINT

1  an email that included an agenda and a written, detailed
2  version of Mr. DeVeney's "Sertant Capital ASPIRE
3  Discovery Analysis." At this time she also scheduled a
4  project kick-off teleconference with Sertant Capital for
5  August 8, 2017.

6      45. Ever mindful of the delays, Sertant Capital
7  again chose to accept even this de minimus progress by
8  LeaseTeam, in hopes of seeing LeaseTeam start work on
9  the bulk of the 24-day Aspire product installation.

10     46. Instead, LeaseTeam again went silent.
11 LeaseTeam's Ms. Montgomery disappeared and was
12 unresponsive to Sertant Capital's outreach after the
13 August 8th teleconference.

14     47. LeaseTeam was not entirely incommunicado
15 however. Without shame, LeaseTeam sent Sertant Capital
16 two more invoices during August, 2017, nos. 041923 and
17 042083. In a continuing show of good faith despite its
18 diminishing view of LeaseTeam's terrible performance,
19 Sertant Capital paid both invoices, which totaled about
20 $5,080.

21     48. Sometime in late August, 2017, with LeaseTeam
22 having failed to meet its promised Aspire delivery
23 during the week of August 21, 2017, LeaseTeam surfaced
24 again. As the deadline week was passing, LeaseTeam
25 informed Sertant Capital that Ms. Montgomery had been
26 replaced by another project coordinator, Ms. Ashley
27 Dahl.

28 ///

49. After four weeks of no work and no progress by LeaseTeam, and while ignoring the failed delivery promise for the preceding weeks, Ms. Dahl reached out to Sertant Capital by telephone and by email on or about September 7, 2017.

50. Ms. Dahl included in that email a detailed statement of work (9/7/2017 SOW), a Project Plan, and a request for detailed business case information that described Sertant Capital's business models and finance and lease transactions.

51. Sertant Capital was again utterly shocked and dismayed that yet another month had now passed. To add to Sertant Capital's distress, Ms. Dahl was assigned to the project with what appeared to be a considerable lack of knowledge of the many prior communications from Sertant Capital regarding its critical business requirements and complex business models and lease and finance transactions.

52. Ms. Dahl's lack of knowledge of Sertant Capital's critical business requirements was especially distressing given that Sertant Capital had communicated such to Mr. Haug and his LeaseTeam colleagues during the January through March "proof of concept" exercises, and again in July during Mr. DeVeney' LeaseTeam "Sertant Capital ASPIRE Discovery Analysis," and again in a follow-up email to Mr. DeVeney after his visit to California.

///

53. To add further insult, Ms. Dahl introduced with her September 7th email a project plan that completely ignored and replaced the Contract "Professional Services (For Budgetary Purposes Only)" 24-day schedule, with a list of tasks that started on July 18th, during Mr. DeVeney's visit, and with the majority of the Aspire configuration and delivery tasks scheduled for completion by about October 20, 2017.

54. This delayed October delivery date was more than two months later than the previously promised August 21, 2017 date, and more than four months later than Sertant Capital's originally expected late-June delivery date.

55. LeaseTeam by way of Ms. Dahl's outreach, seemed again motivated to cure its prior default and failed delivery during August, 2017.

56. Sertant Capital communicated its displeasure at the repeated delays, lost time, and lack of progress in getting the LeaseTeam Aspire installation configured and delivered.  In response, LeaseTeam promised to send two project consultants, Ms. Jessie Loudner and Alex (surname unknown), to Sertant Capital's office in California, on September 11th through the 13th of 2017. In another show of good faith in enabling LeaseTeam another attempt to cure, Sertant Capital agreed to cover the travel, lodging, and food costs.

57. LeaseTeam's goal was to have them accelerate the configuration of LeaseTeam's Aspire installation,

1  and to advance Sertant Capital's ability to regain
2  confidence in LeaseTeam's ability to cure and perform
3  its obligations under the Contract.

4      58. LeaseTeam communicated a detailed agenda the
5  day prior to Ms. Loudner's arrival, which did not enable
6  any time for Sertant Capital to prepare. Only Ms.
7  Loudner showed up at Sertant Capital's office on
8  September 11, 2017.

9      59. LeaseTeam's Ms. Loudner failed to demonstrate
10 LeaseTeam's ability to perform or that Aspire's
11 technical and financial capabilities could meet Sertant
12 Capital's critical business requirements. Instead, Ms.
13 Loudner expressly confirmed Sertant Capital's suspicions
14 that LeaseTeam and the Aspire product specifically could
15 not meet Sertant Capital's most critical business
16 requirements.

17     60. Ms. Loudner communicated during her visit, that
18 Aspire could not meet Sertant Capital's technical and
19 financial requirements, and that despite Mr. Haug's
20 assertions and promises during the proof of concept
21 exercises, LeaseTeam had known about these deficiencies
22 in the Aspire product, because other LeaseTeam customers
23 had previously communicated similar requirements to
24 LeaseTeam.

25     61. According to Ms. Loudner, LeaseTeam had devised
26 work-around solutions that could meet certain, limited
27 aspects of Sertant Capital's requirements. Sertant
28 Capital was preliminarily willing to learn more about

such potential solutions, to learn whether such may satisfy its critical operations and process requirements.

62. After Ms. Loudner's visit to California, Sertant Capital's Chief Financial Officer Mr. Macartney communicated serious concerns to LeaseTeam's Ms. Dahl, in an email dated September 18, 2017. He expressed dismay that the LeaseTeam agenda arrived the afternoon before Ms. Loudner, and that it had become apparent that Aspire's technical and financial capabilities could not meet Sertant Capital's critical business requirements.

63. Ms. Dahl responded the next day with apologies, and promises to try and get the project back on track, so as to have some hope of meeting the newly delayed deadline for delivering the configured and operational Aspire product to Sertant Capital.

64. Ms. Dahl scheduled and performed weekly status updates and teleconferences to monitor daily progress through the remainder of September and October, 2017. However, as the October 20, 2017 deadline approached, it again became apparent that LeaseTeam was making very little progress, and would again be unable to meet the latest deadline, even by extending the deadline to October 31st.

65. Even so, LeaseTeam was not shy about generating another invoice – this time invoice no. 042464 for about $6,798 was delivered to Sertant Capital, which persisted in its good faith efforts to meet its contractual duty,

and to give LeaseTeam every opportunity to overcome its latest failure to deliver the Aspire product on its promised delivery dates of October 20th and then again on the 31st.

66. LeaseTeam during the next weekly meeting of November 7, 2017, deflected responsibility for the latest delay, with suggestions and/or assertions during the weekly engagements that Sertant Capital should have a full-time person dedicated to assisting with LeaseTeam's configuration and delivery efforts.

67. Also during the November 7th meeting, LeaseTeam notified Sertant Capital that it has again replaced its project coordinator. LeaseTeam's Nick McPheron replaced Ashley Dahl, the latter whom LeaseTeam informed may continue assist in a subordinate role.

68. After speaking with Mr. McPheron, Sertant Capital learned that he is primarily assigned by LeaseTeam to a different customer project that spans two-years and which consumes most of his time. Further, Sertant Capital also learned that Mr. McPheron will be out of the office during parts of November, 2017. It is apparent that LeaseTeam has not prioritized meeting its obligations under the Contract. This is evident throughout the remainder of November, 2017, as no substantive progress was made by LeaseTeam in configuring and delivering the Aspire product to Sertant Capital.

///

69. During November, 2017, Sertant Capital attempted to engage another consultant firm in hopes it could resurrect the LeaseTeam Aspire project. Sertant Capital allocated about $30,000 in additional capital for 2017, to engage Shari Lipski of ECS Financial, who it was hoped would assist Sertant Capital in advancing the project despite the LeaseTeam failures. Sertant Capital's financial exposure in the LeaseTeam Aspire project now exceeds $205,000.

70. Even with Ms. Lipski's help, LeaseTeam remained essentially unresponsive in view of Mr. McPheron's competing obligations for other LeaseTeam customers. No substantive progress is made during November.

71. Provided, however, LeaseTeam remained committed to issuing invoices and seeking payments. On about November 9, and November 30, 2017, invoice nos. 042613 and 042941 were respectively presented to Sertant Capital and seek payment totaling more than about $5,000, which Sertant Capital dutifully paid yet again.

72. Sertant Capital became ever more frustrated with LeaseTeam's lack of substantive progress, which continued into December. Confronted by continuing expenses and no work, the time lost and costs incurred during LeaseTeam's September trip to California, and the mounting opportunity costs to Sertant Capital by not having the new software in place and operational, Sertant Capital's now President and CEO, Mr. Krajewski was forced to intervene.

73. Mr. Krajewski reached out by email on December 18, 2017 to LeaseTeam's co-founder and Executive Vice President Mr. Haug.  In that email, he requested that LeaseTeam, at a minimum, provide a refund to Sertant capital as a credit to its account, for some of the hours billed and costs incurred during the failed September trip by LeaseTeam to California.

74. The holiday season came and went, still without any progress by LeaseTeam towards delivering the Aspire product pursuant to the terms of the Contract.

75. Even though it made no progress on its deliverables under the Contract, LeaseTeam did manage to issue yet another invoice in December, 2017, no. 042927, for about $2,421, which Sertant Capital again paid without complaint.

76. On about January 11, 2018, even though LeaseTeam's Mr. Haug never replied to Mr. Krajewski's request for a refund credit, Sertant Capital learned that LeaseTeam had credited a de minimus amount of time,

77. During January and February, 2018, LeaseTeam generated revisions to the Project Plan, and in its latest version, promised a delivery date that was pushed to May 1, 2018.  Almost a year after the Contract was signed, and promising a 24-day configuration and implementation project plan.

78. Despite the lack of real progress by LeaseTeam during January and February, 2018, LeaseTeam was able to ///

generate two more invoices totaling about $7,265, which Sertant Capital again paid.

79. By mid-February, LeaseTeam had still made no substantive progress towards meeting its contractual duties.    Instead, LeaseTeam attempted to schedule another training session with Sertant Capital on February 20, 2018, under the pretense that further delays might be obviated if Sertant Capital staff were better trained on the Aspire product and the work-arounds needed to overcome the Aspire shortcomings.

80. Sertant Capital responded with formal notification that the LeaseTeam Aspire project was on-hold until Mr. Krajewski and Mr. Haug could meet and confer.    After a brief discussion during a meeting in Las Vegas in early March, 2018, Mr. Krajewski sent to Mr. Haug a detailed list of problems that Sertant Capital had encountered in its attempts to assist LeaseTeam with configuring and delivering the Aspire product.

81. Mr. Haug did respond, but delegated a response to LeaseTeam's project coordinator, Ms. Dahl.    Mr. Krajewski again reached to Mr. Haug in late March, 2018, to no avail.

82. Eventually, Mr. Haug responded on about May 22, 2018, exactly one year since the Contract was executed, this time with a new proposal to up-sell Sertant Capital to a more expensive version of the Aspire product, with the assertion that the problems would be addressed

thereby, if Sertant Capital would agree to spend tens of thousands more.

## FIRST CAUSE OF ACTION

### BREACH OF WRITTEN CONTRACT

### (Against Defendant LeaseTeam)

83. Sertant Capital realleges and incorporates herein by reference all of the preceding paragraphs, as though set forth in full herein.

84. On or about May 22, 2017, and as modified by the SOWs and a Project Plan dated September 7, 2017, Sertant Capital and LeaseTeam entered into the Contract, which provided for LeaseTeam to configure, implement, customize, and deploy Aspire for use by Sertant Capital on or about the week of August 21, 2017. After a first delay, delivery was then rescheduled for October 20, 2017. After yet another delay, delivery was again rescheduled instead for October 31, 2017. PSA, Attached hereto with Contract as Exhibit 1.  SOW Dated September 7, 2017 and "Redlined Project Plan" dated September 7, 2017, both attached hereto as Exhibit 2.

85. LeaseTeam failed to meet any of these original and rescheduled delivery dates.

86. Pursuant to the Contract, Sertant Capital did all, or substantially all, of the significant things that the Contract required it to do, including for example, (a) substantively responding to every LeaseTeam request for assistance and information, (b) extending deadlines repeatedly in good faith attempts to enable

LeaseTeam to cure its defaults, and (c) timely making all required payments to LeaseTeam in response to invoices received therefrom.

87. LeaseTeam failed to deliver the promised Aspire product to Sertant Capital, despite Sertant Capital's repeated extensions of time and extensive efforts to assist LeaseTeam in curing its promised but repeatedly missed delivery deadlines.

88. Sertant Capital provided LeaseTeam with payment in full for what it owed LeaseTeam pursuant to the Contract through February, 2018, and thereafter refused payment in view of LeaseTeam's inability to substantially perform its duties under the Contract, and to deliver the Aspire product. Sertant Capital also performed all covenants, conditions and promises required of it pursuant to the terms of the Contract.

89. LeaseTeam breached the Contract by failing to deliver the Aspire product by any of the promised deadline dates. LeaseTeam further breached the Contract by failing to assign a team competent to configure, implement, and deliver the Aspire product.

90. As a result of LeaseTeam's breach of the Contract, Sertant Capital has been damaged in the amount of the value of the Contract, and Sertant Capital's related and necessary expenses, which is a sum of not less than $75,000, as will be proven at trial.

91. The Contract provides that the LeaseTeam will maintain Errors and Omissions Liability Insurance of

1  $3,000,000 to cover damages arising out of negligent
2  acts, errors or omissions committed by LeaseTeam and
3  LeaseTeam's employees in the performance of the
4  Contract. Exhibit 1 at paragraph 5.

5  92. Sertant Capital demands that LeaseTeam tender
6  this action to its insurance carrier and seek payment to
7  Sertant Capital for its damages.

8  93. LeaseTeam breached the Contract in that
9  LeaseTeam and its employees did not perform the Contract
10  services in a professional and workmanlike manner in
11  accordance with recognized industry standards, such that
12  LeaseTeam was not able to and did not deliver the Aspire
13  product. Exhibit 1 at paragraph 8.

14  **SECOND CAUSE OF ACTION**
15  **BREACH OF THE IMPLIED COVENANT**
16  **OF GOOD FAITH AND FAIR DEALING;**
17  **(Against Defendant LeaseTeam)**

18  94. Sertant Capital realleges and incorporates
19  herein by reference all of the preceding paragraphs, as
20  though set forth in full herein.

21  95. California law implies a covenant of good faith
22  and fair dealing in all contracts between parties
23  entered into in the State of California.

24  96. As a result of the actions of LeaseTeam and its
25  employees, and each of them, set forth hereinabove,
26  LeaseTeam and its employees have violated the implied
27  covenant of good faith and fair dealing contained in the
28

Contract as against Sertant Capital and as a result thereof, Sertant Capital is entitled to damages.

97. LeaseTeam's and its employees' actions in failing to deliver the Aspire product to Sertant Capital in violation of said implied covenant of good faith and fair dealing have caused Sertant Capital to suffer damages in that it has lost in an amount exceeding $75,000.

### THIRD CAUSE OF ACTION

### FRAUD

### (Against Defendant LeaseTeam)

98. Sertant Capital realleges and incorporates herein by reference all of the preceding paragraphs, as though set forth in full herein.

99. Sertant Capital is informed and believes, and thereon alleges, that to induce Sertant Capital to execute the Contract and to make payments thereunder, LeaseTeam's Mr. Haug and other of LeaseTeam's employees, made the following intentional misrepresentations, among others, to Sertant Capital:

(a) LeaseTeam and Aspire were technically and financially capable of: (i) meeting Sertant Capital's complex business requirements, and (ii) meeting Sertant Capital's complex business models, and finance and leasing transactions, and

(b) LeaseTeam was capable of configuring, implementing, and delivering to Sertant Capital the Aspire product within the 24-day span of time specified

by the schedule entitled "Professional Services (For Budgetary Purposes Only)" of Exhibit A of the Contract. Exhibit 1 hereto.

100. Sertant Capital is informed and believes, and thereon alleges, that each of the intentional misrepresentations described above was false when made, because LeaseTeam and its employees knew but did not disclose before the Contract was executed, that: (a) the Aspire product could not meet Sertant Capital's critical business requirements, and (b) LeaseTeam had developed work-arounds for similar problems encountered by other of LeaseTeam's customers.

101. Sertant Capital is informed and believes, and thereon alleges that LeaseTeam knew each of the above intentional misrepresentations was false when made, because LeaseTeam and its employees knew of and/or had access to the correct information, or in the alternative, made such representations recklessly and without regard for their truthfulness.

102. Sertant Capital is informed and believes, and thereon alleges, that when LeaseTeam made these intentional misrepresentations to Sertant Capital, it knew them to be false and made these intentional misrepresentations with the intention to deceive and defraud Sertant Capital and to induce Sertant Capital to act in reliance on these intentional misrepresentations in the manner herein alleged, or with the expectation that Sertant Capital would so act.

103. Sertant Capital, at the time these intentional misrepresentations were made by LeaseTeam and at the time Sertant Capital took the actions herein alleged, was ignorant of the falsity of LeaseTeam's intentional misrepresentations and believed them to be true.

104. In reliance on these intentional misrepresentations, Sertant Capital was induced to - and did – execute the Contract with LeaseTeam and make payments for invoices generated by LeaseTeam according to the Contract terms and conditions.

105. Had Sertant Capital known the actual facts, it would not have taken the above-described action. Sertant Capital's reliance on LeaseTeam's intentional misrepresentations without further additional inquiry was appropriate because of Sertant Capital's relationship with LeaseTeam and Sertant Capital's knowledge of LeaseTeam's prior history in the leasing and finance industry.

106. Sertant Capital was harmed by LeaseTeam's intentional misrepresentations alleged herein, because Sertant Capital would not have otherwise executed the Contract, expended the time of its employees, and made payments to LeaseTeam.  Instead, Sertant Capital would have hired another entity that would have completed the job sooner, on-time, and less expensively.

107. As a direct and proximate result of LeaseTeam's intentional misrepresentations as alleged herein, Sertant Capital has been damaged in an amount to

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

be proven at trial, which is a sum yet to be ascertained, but believed to be in excess of $75,000.

108. Sertant Capital is informed and believes, and thereon alleges, that the aforementioned conduct of LeaseTeam, was intended to cause injury to Sertant Capital or was despicable conduct carried on with a willful and conscious disregard of the rights of Sertant Capital, or subjected Sertant Capital to cruel and unjust hardship in conscious disregard of Sertant Capital's rights and/or was an intentional misrepresentation, deceit or concealment of material facts known to LeaseTeam with the intention to deprive Sertant Capital of property, legal rights, or to otherwise cause injury, such as to constitute malice, oppression, or fraud under California Civil Code Section 3294, thereby entitling Sertant Capital to recover punitive damages in an amount appropriate to punish or make an example of LeaseTeam.

109. LeaseTeam's conduct was highly reprehensible because, among other things:

(a) it converted Sertant Capital's payments without performing the work for which the payments were made, which is tantamount to theft;

(b) it caused substantial economic loss to Sertant Capital;

(c) it demonstrated indifference to the rights of Sertant Capital;

///

1          (d) its' misconduct was repeated and

2 continuous, rather than just an isolated incident;

3          (e) it caused harm to Sertant Capital not by

4 accident, but rather by LeaseTeam's intentional malice,

5 trickery and deceit; and

6          (f) Sertant Capital was financially vulnerable

7 as a result of the aforementioned conduct, especially

8 since Sertant Capital devoted its time and money to

9 maintaining its relationship with LeaseTeam at the

10 expense of other industry partner relationships that

11 could have yielded an operational lease management

12 software system. LeaseTeam's actions prevented Sertant

13 Capital from bringing online an operational lease

14 management system, and as a result, damaging Sertant

15 Capital's reputation and relationships with its leasing

16 and financing customers, investors, and collaborators.

17 **FOURTH CAUSE OF ACTION**

18 **NEGLIGENT MISREPRESENTATION**

19 **(Against Defendant LeaseTeam)**

20    110. Sertant Capital realleges and incorporates

21 herein by reference all of the preceding paragraphs, as

22 though set forth in full herein.

23    111. Sertant Capital is informed and believes, and

24 thereon alleges, that to induce Sertant Capital to

25 execute the Contract, make payments thereunder to

26 LeaseTeam, the co-founder and Executive Vice President

27 of LeaseTeam, Randy Haug, negligently made the following

28 misrepresentations, among others, to Sertant Capital:

1        (a) LeaseTeam and Aspire were technically and
2 financially capable of: (i) meeting Sertant Capital's
3 complex business requirements, and (ii) meeting Sertant
4 Capital's complex business models, and finance and
5 leasing transactions,

6        (b) LeaseTeam was capable of configuring,
7 implementing, and delivering to Sertant Capital the
8 Aspire product within the 24-day span of time specified
9 by the schedule entitled "Professional Services (For
10 Budgetary Purposes Only)" of Exhibit A of the Contract.
11 Exhibit 1 hereto.

12    112. Sertant Capital is informed and believes, and
13 thereon alleges, that each of the misrepresentations
14 described above was false when made, because LeaseTeam
15 and its Aspire product had no such capabilities.

16    113. Sertant Capital is informed and believes, and
17 thereon alleges, that when LeaseTeam made these
18 negligent representations, it had no reasonable grounds
19 for believing them to be true because the true facts
20 were known to LeaseTeam.

21    114. Sertant Capital is informed and believes, and
22 thereon alleges, that when LeaseTeam made these
23 misrepresentations to Sertant Capital, LeaseTeam knew
24 them to be false and made these misrepresentations with
25 the intention to deceive and defraud Sertant Capital and
26 to induce Sertant Capital to act in reliance on these
27 misrepresentations in the manner herein alleged, or with
28 the expectation that Sertant Capital would so act.

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

COMPLAINT

115. Sertant Capital, at the time these misrepresentations were made by LeaseTeam and at the time Sertant Capital took the actions herein alleged, was ignorant of the falsity of LeaseTeam's misrepresentations and believed them to be true. In reliance on these misrepresentations, Sertant Capital was induced to, and did, execute the Contract and make payments thereunder to LeaseTeam.

116. Had Sertant Capital known the actual facts, it would not have taken the above-described actions. Sertant Capital's reliance on LeaseTeam's intentional misrepresentations without further additional inquiry was appropriate because of Sertant Capital's relationship with LeaseTeam and Sertant Capital's knowledge of LeaseTeam's history in the leasing and finance industry. Thus, Sertant Capital's reliance was not unreasonable. Sertant Capital was harmed by LeaseTeam's misrepresentations alleged herein, because Sertant Capital would not otherwise have executed the Contract and made payments to LeaseTeam.

117. As a direct and proximate result of LeaseTeam's misrepresentations as alleged herein, Sertant Capital has been damaged in an amount to be determined at trial, which is a sum not yet to be ascertained, but believed to be in excess of $75,000.

///

///

///

# FIFTH CAUSE OF ACTION

## UNFAIR BUSINESS PRACTICES,

### Calif. Business & Professions Code §17200

118. Sertant Capital realleges and incorporates herein by reference all of the preceding paragraphs, as though set forth in full herein.

119. By reason of LeaseTeam's fraudulent, deceptive, unfair, and other wrongful conduct as herein alleged, LeaseTeam has violated California Business and Professions Code §17200 et seq. by consummating an unlawful, unfair, and fraudulent Contract and business practice, which was designed to deprive Sertant Capital of the delivery of the Aspire product and the payments made by Sertant Capital to LeaseTeam.

120. Calif. Business & Professions Code (CBPC) §17203 authorizes injunctive and restitutionary relief against any person who has engaged in and/or proposed to engage unlawful, unfair, and fraudulent business practices. LeaseTeam has been unjustly enriched by virtue of their unlawful, unfair, and fraudulent business practices, as set forth herein.

121. By reason of the foregoing, and as a direct and proximate result of LeaseTeam's unfair competition, Sertant Capital has suffered and continues to suffer injury, harm, and damages in a sum which is, as yet unascertained, and will continue to so suffer, unless LeaseTeam is enjoined from the conduct alleged herein. Sertant Capital will ask leave of the Court to amend its

complaint when the true nature and extent of Sertant
Capital's injury, harm, and damages have been
ascertained.

### SIXTH CAUSE OF ACTION

### DECLARATORY RELIEF

122. Sertant Capital realleges and incorporates
herein by reference all of the preceding paragraphs, as
though set forth in full herein.

123. As a party who entered into a Contract with
LeaseTeam and given that LeaseTeam has breached the
Contract and received payments thereunder from Sertant
Capital, Sertant Capital is entitled to a declaration
that: (a) Sertant Capital is entitled to a refund of all
payments made to LeaseTeam, (b) LeaseTeam has breached
the contract, (c) Sertant Capital has properly
terminated the Contract, (d) Sertant Capital is not
liable to pay amounts demanded by LeaseTeam, (e) Sertant
Capital is not liable to for any further payments to
LeaseTeam under the Contract and for any other reason,
(f) LeaseTeam may not use Sertant Capital's name,
likeness, logo, and information in any way for purposes
of marketing Aspire and LeaseTeam products and services,
and (g) LeaseTeam must immediately remove all
information and material that identifies and refers to
Sertant Capital in any way from LeaseTeam's literature,
website, blogs, new wire repositories, and all other
physical and electronic locations.
///

### SEVENTH CAUSE OF ACTION

### ACCOUNTING

### (Against Defendant LeaseTeam)

124.  Sertant Capital realleges and incorporates herein by reference all of the preceding paragraphs, as though set forth in full herein.

125.  As a party who entered into a Contract with LeaseTeam and given that Sertant Capital has made payments against invoices issued by LeaseTeam, Sertant Capital is entitled to an accounting of the monies paid to LeaseTeam, and an accounting of claims tendered by LeaseTeam to its errors and omissions liability insurance carrier.

126.  Sertant Capital demands that an accounting be made by LeaseTeam and delivered to Sertant Capital once the accounting is completed.

WHEREFORE, Sertant Capital prays judgment as follows:

### As to the First Claim for Relief:

1.  For actual and compensatory damages, including lost profits, in the principal amount of not less than $75,000, according to proof at trial;

2.  For all other appropriate equitable relief;

3.  For any further relief that the Court considers proper.

### As to the Second Claim for Relief:

4.  For actual and compensatory damages, including lost profits, in the principal amount of not less than

$75,000, according to proof at trial;

5. For all other appropriate equitable relief; and

6. For any further relief that the Court considers proper.

**As to the Third Claim for Relief:**

7. For actual and compensatory damages, including lost profits, in the principal amount of not less than $75,000, according to proof at trial;

8. For all other appropriate equitable relief;

9. For punitive and exemplary damages as shall be determined at trial; and

10. For any further relief that the Court considers proper.

**As to the Fourth Claim for Relief:**

11. For actual and compensatory damages, including lost profits, in the principal amount of not less than $75,000, according to proof at trial;

12. For all other appropriate equitable relief; and

13. For any further relief that the Court considers proper.

**As to the Fifth Claim for Relief:**

14. For judgment against LeaseTeam and restitution to Sertant Capital, and disgorgement if available, of all sums acquired by LeaseTeam by means of their unlawful, unfair, and fraudulent business practices, according to proof at trial;

///

///

1    15. For interest on these sums at the legal rate
2 and over the earliest appropriate date according to
3 proof at trial;

4    16. For punitive damages and injunctive relief to
5 punish LeaseTeam for and prevent future injury and harm
6 from their unlawful, unfair, and fraudulent business
7 practices, according to proof at trial;

8    17. For all other appropriate equitable relief; and

9    18. For any further relief that the Court considers
10 proper.

11 **As to the Sixth Claim for Relief:**

12    19. For declarations that: (a) Sertant Capital is
13 entitled to a refund of all payments made to LeaseTeam,
14 (b) LeaseTeam has breached the contract, (c) Sertant
15 Capital has properly terminated the Contract, (d)
16 Sertant Capital is not liable to pay amounts demanded by
17 LeaseTeam, (e) Sertant Capital is not liable to for any
18 further payments to LeaseTeam under the Contract and for
19 any other reason, (f) LeaseTeam may not use Sertant
20 Capital's name, likeness, logo, and information in any
21 way for purposes of marketing Aspire and LeaseTeam
22 products and services, and (g) LeaseTeam must
23 immediately remove all information and material that
24 identifies and refers to Sertant Capital in any way from
25 LeaseTeam's literature, website, blogs, new wire
26 repositories, and all other physical and electronic
27 locations.
28 ///

1   **As to the Seventh Claim for Relief:**

2   20. For an accounting from LeaseTeam of the

3   payments made by Sertant Capital and received by

4   LeaseTeam, and claims tendered by LeaseTeam to is errors

5   and omissions liability insurance carrier;

6   21. For all other appropriate equitable relief;

7   22. For any further relief that the Court considers

8   proper.

9   **As to all Claims for Relief:**

10   23. For all other appropriate equitable relief;

11   24. For costs of suit; and

12   25. For such other relief that the Court considers

13   proper.

14   DATED:  June 20, 2018       BUCHALTER
                                  A Professional Corporation

15

16

17                              By:  */s/ Sean M. Casey*
                                     MARK M. SCOTT

18                                   SEAN M. CASEY
                                     Attorneys for

19                                   Plaintiff
                                     SERTANT CAPITAL

20

21

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

BN 33298676v1                        38

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2      Sertant Capital hereby demands a trial by jury as to

3 each and every item to which it has such right.

4 DATED:   June 20, 2018        BUCHALTER
                                A Professional Corporation
5

6

7                               By:  /s/ Sean M. Casey
                                     MARK M. SCOTT
8                                    SEAN M. CASEY
                                     Attorneys for
9                                    Plaintiff
                                     SERTANT CAPITAL
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

                          COMPLAINT